Collins vs. Heath et al.

STEPHEN COLLINS, *prochein ami* of Mary Ann Binn and Frances Jane Binn, plaintiff in error, vs. WM. B. HEATH and AMANDA KNIGHT, defendants in error.

The doctrine that a purchaser for value, without notice of fraud in the vendor's title, is protected, is applicable to this case, and controls it.

In Equity. In Bibb Superior Court. Bill for Discovery and Relief. Tried before Judge LOCHRANE. May Term, 1863.

In April, 1863, this bill was filed, alleging that in November, 1852, Wilson Binn, the father of the two minors for whose benefit the suit was brought, purchased of Elbert Martin a tract of land in Bibb county, west of Vineville, (describing its boundaries) containig three quarters of an acre, for one hundred and seventy dollars, giving his promissory notes therefor, in sums ranging from ten to twenty-five dollars, and falling due at different times between March 10th, 1853, and July 10th, 1854; and taking Martin's bond for titles to be made on payment of the notes. That, in September, 1865, while an action for divorce *a vinculo matri monii* was pending between Wilson Binn and his wife, Susan Binn, which divorce was subsequently granted, the said Wilson made over, by deed, this land and all his interest therein to said minor children, together with another lot adjoining it containing one-fourth of an acre. That the notes given to Martin for the purchase money, have been fully paid by Wilson and Susan Binn; but that the said Wilson being indebted to the defendant, Heath, in the sum of $30, delivered to him the bond for titles, with instructions to have a deed executed by Martin, to him, Binn,—authorizing him, Heath, to retain the same until his account for $30 should be paid. (The complainant explained, however, by amendment to the bill made at the trial, that this allegation of authority to retain, etc., was not made upon the representation of said Wilson Binn and was not his

statement, the bill having been drafted in his absence and without any consultation with him). That Heath never paid any of the purchase money; but to defraud Binn and those children, he took a deed from Martin to himself, instead of to Binn as he was instructed to do.

That he had been frequently applied to by Susan Binn to give up the land to some reliable person, that it might be rented out, and the rent applied to Heath's claim against Binn until paid; but he had refused, saying that he would keep possession until his claim was satisfied out of the rents and profits. That he had, for eight years, rented it, receiving several hundred dollars, all of which except $30 ought to be accounted for to these children. That there was a good framed house on the lot, which rented for four or five dollars a month. That the adjoining lot, conveyed to the children by the same deed, was under the same fence with this, and that it, also, had been taken possession of by Heath, and he had received the rents, worth two dollars a month, to his own use. That it had upon it a good house, and that he had torn the house down. That in 1861 Heath pretended to sell the lot deeded to him by Martin, to the other defendant, Mrs. Knight, but that the sale was not *bona fide*, but fraudulent and pretended,—made to deprive these children of their legal remedies.

The bill prayed that the deed from Martin to Heath, and that from Heath to Mrs. Knight be set aside and cancelled; that title vest in the children according to the deed from their father; and that Heath account for the rents and profits " of said land and houses"; or, if the deeds were valid, that Heath account for the value " of said land and houses " and for the rents and profits thereof.

Heath, by his answer, denied all knowledge of Binn's deed to his children until some four or five years after its date. He alleged, that some time in the year 1855, Binn, finding himself unable to pay off what was due on his notes to 'Martin, and owing Heath himself two notes, one for

$46.90 dated July 4th, 1854, the other for $37, dated January 5th, 1855, both due one day after date, and the latter given in settlement of an account, brought to him Martin's bond for titles and requested him to take up the notes held by Martin and take to himself titles from Martin, as security for the money advanced and for the two notes just described. That he consented, paid the money, and took the title to himself accordingly. That Binn, at the time of making this arrangement, said he would, when he got able, discharge the debts and redeem the land. That he afterwards paid the land notes, but not the others, which amount now, principal and interest, to about $129, and not having been legally renewed, are barred by the statute of limitations. That within the last three years Binn repeatedly told him to sell the land and apply the proceeds in payment of these notes. That about the last of April, 1860 or 1861, he sold it to Mrs. Knight, *bona fide*, for $90, and executed a deed. That Mrs. Knight paid him $10 for rent before the sale, up to which time he had received $15 in all for rent. That Mrs. Binn lived on the premises without charge some years after he got title. That the price he sold for was as much as he could get, the lot being only about one-fourth of an acre and of very little value—the building a poor sort of shanty building—the whole, he thinks, not worth now over $50. That he considered the rent received and the proceeds of the sale about paid his debt, and he is ready to surrender the notes. That, as to the other parcel of land, he never exercised any control over it. That while Binn's family resided on the Martin lot, they or Binn put both under one enclosure, but when he, defendant, rented, he pointed out the dividing line. That he never made any claim to the other lot, nor did he pull down the house—it rotted down.

Mrs. Knight, in her answer, stated that knowing nothing of the transaction by which Heath acquired title, she paid him $100 for the lot, in good faith, without notice of any of the facts charged affecting his title. That her purchase was

not pretended or fraudulent, but *bona fide;* and that she paid all the premises were worth at the time.

The evidence introduced was as follows:

### For Complainant.

*Wilson Binn*—Some time in the year 1854 he handed William B. Heath a bond for titles for the Martin lot, executed by Elbert Martin to him, and for which he, Binn, had given Martin his notes, as stated in the bill, to get the titles from Martin to him, Binn; that he, Binn, had before paid a part of the purchase money, leaving a balance still due. The way Heath got possession of the purchase money notes, was this: Heath sold Martin a mule and took the notes in payment before witness left the bond for titles with him, Heath. Never authorized him, Heath, to have the titles conveyed to himself to secure a debt due by witness to Heath: he never transferred the bond for titles. He owed him some, but does not know how much—thinks it was very little.

*Susan Binn*—Paid the money on the last purchase money-note to William B. Heath, and took it up, when Heath acknowledged to witness that that was the last payment towards the land. Heath at first refused to give up the note, but I told him to give me back the money, $15.00, for I would not pay Binn's grog bills. Rather than return me the money, he gave me the note: I then called on Heath for the deed. He said he would not give up the deed until I paid him what Binn owed him. I asked him how much it was. He said $30.00, which, if I would pay, he would give up the deed. I told him I would not pay it, because it was a grog bill. This was the same year Heath got the deed.

About two years after this, when I was about leaving for Tennessee, I engaged with Mr. Brewer to take possession of the place and rent it; but Heath said nobody should rent it, he would rent it himself; and then I went to see Heath about it. I told him I was going away, and wanted Brewer to take the place and rent it out. He said he would not give it up

to any body until he got what Binn owed him. I asked him how much it was, and he said $30.00, which, if I would pay, he would give it up to me. I told him I did not have the money, and if he would let Brewer have it, he would rent it out and settle the debt with him. He said he wouldn't let any one have it—he would rent it himself. I replied, if you are going to rent it, you will rent out both places until you get satisfied for the debt Binn owes you. "Yes," he said, "I will do so, and when the debt against Binn is satisfied I will send you the rent." I told him I would leave on those terms. He said, "well, he would attend to it." While I was absent I wrote Heath, but he never answered my letter. I came back to Macon to attend to it myself, having been absent about three years. I called on Heath and told him I had come to see about the place, and asked him if he had collected any rent. He said, "no, I have not." I told him he had had it long enough to satisfy the debt, and to give up the place, and I would get some one to take it that would collect the rent. He said he was a feeling-hearted man, and had let a widow live in it for nothing. I told him he had no right to do that, for if any widow needed it I did, for Binn gave the place to his children, and I had them to raise. He told me to go on, he did not want to say anything to me about it, he would talk to Binn about it, and ordered me out of his house. The places were renting for six dollars a month when Heath took them.

The Teels all knew about Binn's having made a deed to his land to his children. After Mrs. Knight bought the place, she told me, when I was out there one day, when I asked her if she bought the place, that she knew nothing about Binn's deed to his children. Teel lived in the house with Mrs. Knight when she bought the land. They lived together as man and wife, at least, I suppose so.

I got six dollars a month for the place when I rented it, until the kitchen burnt down; I then got five dollars per month. When Binn bought the place, we moved out there and lived two years, and then rented it out for one year. I

got dissatisfied out there, and concluded to move to town, and rent the place out. I did not pay Heath rent. Sometime after I came from Tennessee, I had another interview with Heath, in which he said if I would pay $30.00 he would give up the lot. I agreed to do so, but never paid it.

*Thomas A. Brewer*—At the request of Mrs. Binn, agreed to act as agent for the children, and receive the rent.

Called on Heath for the title papers, and he refused to give them up till $30.00 which Binn owed him was paid. After a short time, I called again, when he said Binn owed him $50.00 and would not give up the title till it was paid. After allowing for taxes, repairs, for time the house was likely to be vacant, and all other contingencies, the property was worth $4.00 per month, net, for rent.

Teel told me he bought the lot from Heath, himself, and paid $150 for it.

Complainant then put in evidence the deed from Binn to his children. Also, the notes given by Binn to Martin for the lot, which had been settled and cancelled. It was admitted that Mrs. Binn was divorced from her husband, as stated in the bill.

*Joel Branham*—Testified that J. J. Teel, some two days before the trial remarked to him, in speaking of the two parcels of land, and in laying claim to the quarter of an acre which had the dwelling house on it, "This is the place that I bought."

## For Defendants.

The defendants read in evidence a deed from Martin to Heath, bearing date in the latter part of the year 1854, prior to the deed from Binn to his children, conveying the premises in dispute as one-fourth of an acre; also, a deed from Heath to Mrs. Knight for the same premises, dated April 21st, 1861; also the two notes made by Binn, mentioned in Heath's answer.

*J. J. Teel*, sworn—He worked with Binn a good deal,

and has a number of times heard him say that he authorized Heath to take the bond for titles given by Martin to Binn, and get a deed to Heath as security for a debt Binn owed him. Has also heard him say the lot in question was Heath's, and he could do as he pleased with it. The house on the lot was much out of repair. While Heath had it the kitchen was burnt down. It was a one-room house, without a chimney,—was worth very little for rent, and hard to get any one to accept it.

*Cross examination.*—Said he did not, as he knew of, tell Mr. Brewer two years ago that he had bought the lot and gave $150.00 for it. Don't think he told Mr. Branham, in his office the other day, that he had bought the place. He had no interest in the lot—it belonged to Amanda Knight. She was not his wife.

*John J. Riley*—Was well acquainted with Wilson Binn since 1857, and thinks he knew him from before the year 1854 to 1857, and he was, during all that time, reputed and known as insolvent.

*Warren Riley*—Had known Wilson Binn since 1853, and in 1854 and 1855 he was known and regarded as insolvent. He was in debt, and had no property, unless it was a chest of tools and the lot in question, which was not known as his.

Counsel for defendants requested the Court to charge—

1. If the jury believe the deed of gift was made by Binn to defraud his creditors, or that he was then insolvent, the deed is void, and his children can take no rights under it.

2. If the jury believe Binn got Heath to advance the purchase money and take title in himself as security for that and for another debt then owed by him to Heath; and that, by reason of Binn's insolvency or inability to pay his debts, the debt intended to be secured remained unpaid at or after the execution of the deed of gift, then the deed was in fraud of the rights of Heath and those claiming under him.

3. If the jury believe Mrs. Knight bought the lot of Heath under title from Martin, *bona fide*, for value and without notice of the deed of gift or the circumstances alleged as

57

affecting Heath's title, then her title remains good. If the deed of gift was recorded in the time required by law, she had good constructive notice; but if not, and especially if it remained unrecorded for years and till after she purchased, actual notice of the deed must be brought home to her.

4. If the jury find in favor of Mrs. Knight, then they will inquire whether, by agreement with Binn, Heath was authorized to take the title from Martin to himself, as security for debts, as Heath claims; and whether Heath was subsequently authorized by Binn to sell the place to pay said debts: if they find all this to be true, then they will find generally in favor of Heath. But whether he was specially authorized to sell or not, if they believe a reasonable time had elapsed, in which Binn was to redeem, and he failed to do so; or if the jury find that the accruing interest, added to the principal and yearly taxes, amounted to more than the value of the lot and yearly rents, and especially if the debt was about to be barred by the statute of limitations, and remains unpaid, then he was justified in selling under the circumstances. But if the jury find that the title was properly in Heath as security for his debt, but that he was not authorized to sell or convert the lot, they will then set off the value of the lot and such rents as he ought to account for against the amount of any debt Binn owes Heath.

The 1st, 2d, and 4th requests the Court declined to charge; but the charge given was as follows:

"In this case I charge the jury that they must first look to the character of the transaction between Binn and Heath at the time he left with him, or gave him, the bond for titles. If, from this evidence, the jury believe Binn left the bond for titles with Heath to get the deed from Martin to him, Binn, and Heath went and took a deed to himself, in the opinion of the Court, the deed thus fraudulently obtained, should be set aside, and parties could not claim title derived from Heath, as against the true owner, but these deeds should, also, be cancelled. But, on the other hand, if the jury believe from the evidence, that, at the time Heath took

the bond for titles, it was an agreement or understanding between the parties, Binn and Heath, that Heath should take title to himself, and hold it until he was paid a money-demand he held against Binn, then, in the opinion of the Court, Heath took the property as trustee, and is liable to account for the property itself, if sold, and also for the rents he actually received, or might have received with proper diligence, such as a man would exercise over his own property,—the rule being, that he is not bound for rent himself, but for what he did or could have received in the manner stated. This would be the liability of Heath, in case he took the property or bond for titles with an understanding or agreement. If they believe this to be the truth, then Heath was entitled to a credit for whatever amount he proved due to himself.

The deed made by Binn to his children, I am asked to charge you, was not good as against Heath or those claiming under him, if Binn was owing Heath at the time and was insolvent, The principle of law that a deed made to defraud creditors is void as against creditors, is true; but I cannot charge you that such was the effect of the deed made by Binn to his children, as against Heath. This question is before you in all its aspects. The children of Binn claim against Heath, on the ground of his alleged fraud in taking title to himself which should have enured to them through their father. The request means, that if Binn was insolvent when he made the deed to his children, and owing, the deed was a fraud on Heath's rights, and the children can take no rights under it. I decline to charge this. You are trying the facts of the case, as to whether Binn owed Heath, how much, and if it is not paid: you have the whole equities of these parties before you, and I leave for you the decision of the facts. The amount of the lot was proved to be under the value of what the law exempts from sale for debts of Binn, and, in equity, the wife and children had a claim upon it superior to that of creditors; and you can consider this, in view of the insolvency of Binn, and say whether the deed to

the children, by Binn, was a fraud on Heath. The character of the deed became important in relation to the rights of Amanda Knight. I give in charge defendant's third request, to-wit: "If the jury believe Amanda Knight bought the lot of Heath under title from Martin, *bona fide*, for value, and without notice of the deed of gift or of the circumstances alleged as affecting Heath's title, then her title to the lot remains good." If you believe the act of Heath, in the first instance, was fraudulent, and that he had no authority to take titles in himself, (and the fact that there is no written transfer of the bond for titles, is a circumstance the jury may weigh with the evidence upon this point) if, from the evidence, the answer of defendant's under the rule laid down, the language of witnesses, you believe Heath was not authorized to take a deed to himself, then, in my opinion, Heath had no title he could convey, and Amanda Knight's title, if thus derived, must stand or fall by that of her feoffor; but if any understanding existed about Heath taking title, or holding the property, as his own, and Amanda Knight bought from him without actual notice of the complainant's claim, she is protected in equity, and the faithlessness of a trustee cannot destroy the validity of her title. A *bona fide* purchaser for value and without notice of an equity, will not be interfered with by a Court of equity."

The jury returned the following verdict: " We, the jury, cancel both deeds,—the property in dispute to vest in the children of Wilson Binn; and, also, find that the defendant pay three dollars per month from January 7th, 1857, to the present time, amounting to $229.50, deducting from said amount two notes and interest, $96.50, leaving the balance for plaintiff, $133.00."

Whereupon defendants moved for a new trial, on several grounds:

1. Because, although defendants' counsel objected, the Court permitted Susan Binn and T. A. Brewer to testify to the admissions of Heath in conversation with them in relation to the amount of indebtedness from Binn to Heath, the

same appearing to have been made during negotiations for a compromise.

2. Because the Court refused to charge the 1st, 2d, and 4th requests.

3. Because the Court erred in charging, as to the insolvency of Binn, what the charge sets forth.

4. Because the Court charged, that if Heath was not authorized to take a deed to himself, then he had no title he could convey; and that Mrs. Knight's title, if thus derived, must stand or fall by that of her feoffor.

5. Because the Court charged that if Heath, by an understanding with Binn, took the title to himself as security for a debt, he could transmit title to Mrs. Knight, who, if an innocent purchaser, would be protected; but if he took the title without such understanding, it was fraudulent, and he had none which he could convey to Mrs. Knight, and the deed to himself and the one to her should be cancelled.

6. Because the verdict is too indefinite and uncertain to be executed—in this: 1. It cancels "both deeds" without specifying them, when there were three in issue—that from Binn to his children, that from Martin to Heath, and that from Heath to Knight: 2. It finds that "the defendant" pay $3 a month, etc., without specifying which of the two defendants: 3. It fails to state what the money is to be paid for—whether for rent or the value of the property; and if for rent, whether for the one lot or for the other specified in the bill, or part for one and part for the other : 4. While it vests in the children the premises in dispute, it does not describe them so that they can be identified and located; nor can the premises meant be ascertained by reference to the plaintiff's bill and the proof in support of it: 5. All the issues are not covered by the verdict, the defendant being charged with using and renting another lot enclosed under the same fence, and with tearing down the house, in relation to which there was proof, and it does not appear whether the jury found for or against Heath or Kight on this charge.

7. Because the money-part of the verdict is for a larger sum than the verdict itself will justify by its terms.

8. Because the Court charged that the jury might weigh the fact, that there is no written transfer on the bond for titles.

9. Because the verdict is contrary to the evidence, to equity, without evidence, and contrary to the charge of the Court.

The Court granted a new trial; and this is complained of as error.

WHITTLE, for plaintiff in error.

LANIER & ANDERSON, for defendants.

LUMPKIN, C. J.

It is needless to rehearse the testimony on the trial. Suffice it to say, that Heath and Amanda Knight utterly deny all the equity in the bill. Both alleging that the conveyance from Martin to Heath, and Heath to Amanda Knight were *bona fide* transactions, and made upon a fair consideration. Upon the trial, the Court charged the jury in substance, that if Heath took the title to the lot, without authority from Martin, and in fraud of Binn's rights, that his title was bad, and that he could convey no title to Mrs. Knight. Upon a motion to set aside the verdict rendered in favor of the complainant and grant a new trial, the presiding Judge discovered and corrected his own error, and granted a new trial. And this was right. In *Trueluck and others vs. Peeples and others*, 3 *Ga. R.*, 446, this Court held, that where a purchaser of land, *without notice* of any fraud or defect in the title, purchases from one affected with notice, the former will be protected. So, where a purchaser with notice purchases from one without notice, the purchaser with notice will be protected. For otherwise, a *bona fide* purchaser might be deprived of the benefit of selling his property

for its full value; and this doctrine has been uniformly maintained by this Court, and it controls this case, and must finally prove fatal to it, unless this proof is supplied.

Judgment affirmed.